UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GARY DANIEL RODGERS                         CIVIL ACTION

VERSUS                                      NO.  15-2642

JEFFERSON PARISH                            SECTION "F"(2)
SHERIFF OFFICE ET AL.

**FINDINGS AND RECOMMENDATION**

Plaintiff, Gary Daniel Rodgers, is a convicted inmate currently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.  He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983.  The sole remaining defendant is former Jefferson Parish Sheriff's Deputy Jamal Perrier.[1]  Rodgers alleges that on December 11, 2014, while he was incarcerated as a pretrial detainee in the Jefferson Parish Correctional Center, Perrier failed to protect him from harm; specifically, from other deputies' use of excessive force against him.

Trial/evidentiary hearing was conducted on November 29, 2016 before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.2(A).  The court having made the evaluation required in Latiolais v. Whitley, 93 F.3d

---

[1]Plaintiff's claims against Jefferson Parish Sheriff Newell Normand were dismissed after a settlement was reached between plaintiff and the Sheriff only.  Defendants Roney McIntyre, Jr. and Jairus Boudoin were never served with the complaint after the United States Marshal could not locate them, and plaintiff's claims against them were dismissed without prejudice under Fed. R. Civ. P. 4(m). Record Doc. No. 52.

205 (5th Cir. 1996), Record Doc. No. 33, plaintiff, appearing pro se, participated by video conference.  42 U.S.C § 1997e(f)(1).  H. Thomas Murphy, III represented the defendant.

Based upon the following proposed findings of fact and conclusions of law, **IT IS RECOMMENDED** that plaintiff's claims against Perrier be **DISMISSED WITH PREJUDICE** and judgment entered for defendant.

I.    EVIDENCE AT TRIAL

Plaintiff participated and testified by telephone.  42 U.S.C. § 1997e(f)(1).  All other witnesses appeared in person.  The following is a summary of the evidence offered at trial:

A.    Plaintiff's Case-in-Chief Witness Testimony

1.    Plaintiff's Testimony

Rodgers testified that he is currently incarcerated at Angola, having been convicted of aggravated rape and sexual battery on April 30, 2015, for which he is serving a sentence of life in prison plus 60 years.  He confirmed that his sole claim in this case is that, while he was incarcerated at Jefferson Parish Correctional Center as a pretrial detainee on December 11, 2014, Perrier, who was then a Sheriff's deputy, failed to protect plaintiff from the use of excessive force against him by other deputies.

Rodgers said that the subject incident occurred about 10:00 a.m. on December 11, 2014.  He stated that Perrier was assigned to escort him from the isolation cell where plaintiff was being held on the third floor of the jail to the shower on the second floor.  He said he was shackled for the transport.  Rodgers stated that Deputy Jairus Boudoin arrived

outside the isolation tank, started harassing plaintiff, tried to provoke him and pushed him. Rodgers testified that Boudoin told defendant Perrier to remove plaintiff's handcuffs and that Perrier did so.  Plaintiff said that Deputy Roney McIntyre then came up and pulled plaintiff down to the ground, where Boudoin punched Rodgers in the face with his fist two or three times, and that a metal ring on Boudoin's hand cut his face.  Rodgers said that McIntyre also started "pounding and beating me," and that the beating "went on for a good ten minutes."

Plaintiff testified that other deputies surrounded him, including Deputies Perrier, Rodriguez, Franklin and another whose name he could not remember.  Rodgers said that Perrier did not hit him, but did not protect him from being assaulted by McIntyre and Boudoin.  Plaintiff stated that Perrier put him in a position to be assaulted, instead of taking him to the shower as defendant was supposed to do.

Rodgers testified that Sergeant Patterson arrived on the scene, "got McIntyre off" him and handcuffed him again, after which some deputies escorted plaintiff to the medical unit, where he was treated for his injuries, including receiving stitches for the cuts on his face.  He said he had a cut under his eye and another under his chin, a fractured cheek, cuts on both elbows and severe pain in his knees.  Plaintiff testified that his injuries healed in one and one-half months.  He said he has a one- to two-inch scar under his left eye and two- to three-inch scars on both elbows.

Rodgers stated that he was taken to see an eye doctor while he was still incarcerated in Jefferson Parish Correctional Center and that he is losing sight in his left eye as a result of his injuries.  He said he is 31 years old and had 20/20 eyesight before the incident, but now has a blur in his left eye and must wear glasses.

On cross-examination, Rodgers testified that Boudoin was not assigned to his area of the jail, but came from somewhere else.  He said that Boudoin told him to go back in the isolation cell.  Plaintiff denied that he had refused to take a shower at 8:25 a.m. on December 11, 2014, as reflected in the Sheriff's log book.  He stated that he would not have been removed from his cell if he had refused to shower.

Rodgers said he was in handcuffs when defendant Perrier opened the isolation cell. He testified that Perrier had cuffed him through the food slot in preparation for taking plaintiff to the shower.  Rodgers stated that, because of the cuffs, the only way he could remove the styrofoam food trays from his cell was to slide them out with his feet when Perrier opened the door.  He said he would normally slide the trash out into the hall and the "hall man" would pick it up.  Rodgers denied that he kicked the trays at the deputies on December 11, 2014 or that anyone told him to go back in the cell to clean it up.  He said he could not slide the trays out into the hall to the left or right as he usually did because the deputies were surrounding him when the door was opened, so he moved the trash out to the center with his feet.  Rodgers said he was in the isolation cell because he was in administrative segregation.

4

2.    Testimony of Deputy Antonio Rodriguez

Antonio Rodriguez testified that he has worked for the St. Charles Parish Sheriff's Office corrections department for the past nine months.  He said he previously worked for the Jefferson Parish Sheriff's Office from June or July 2013 until April 2016, when he left to take a new job.

Rodriguez stated that he was employed at the Jefferson Parish Correctional Center on December 11, 2014. He said he was assigned that morning to Pod 3 Alpha, the lockdown tier, and his post was down the hall from the isolation cell where plaintiff was housed. Rodriguez stated that defendant Perrier was assigned to escort inmates to showers.

Rodriguez testified that plaintiff initially refused to take a shower, so Rodriguez came down the hall to see if he could help. He stated that Sgt. Rogers arrived on the scene and asked plaintiff if he wanted to take a shower, and that plaintiff said yes.

Rodriguez testified that he went back to his pod but returned to the area of plaintiff's cell a little while later when he heard a "commotion" from that area. He said he saw plaintiff standing outside the cell, handcuffed with his hands behind his back and laughing. Rodriguez stated that Boudoin was yelling at plaintiff to "'make a move, be a man,' something along those lines," and that Boudoin told McIntyre to take plaintiff's handcuffs off. Rodriguez said he told everyone to put plaintiff back in his cell and that he was going to notify Sgt. Rogers. He testified that McIntyre, not Perrier, removed plaintiff's cuffs and that Boudoin then struck Rodgers on the right side of the head with Boudoin's left fist.

5

Rodriguez stated that McIntyre pulled plaintiff to the ground and began hitting him. He said that Perrier stood there and did not put his hands on Rodgers in any way.

Rodriguez testified that he and Perrier both called a code "108" on their radios, meaning that an officer needs assistance. He said that several deputies arrived within moments. He stated that Rodgers was bleeding from his head. Rodriguez said he wrote a report about what he saw.

Rodriguez testified that another deputy, whose name he could not recall, told him that plaintiff had refused to take a shower, but Rodriguez did not hear plaintiff say that. Rodriguez said that, according to protocol, he logged the other deputy's report to him as a refusal in the log book. Rodriguez stated that he did not hear the conversation between Sgt. Rogers and plaintiff, but that Sgt. Rogers told him that plaintiff could go to the shower. Rodriguez said that defendant Perrier handcuffed plaintiff and removed him from his cell because Perrier would not have done it without the sergeant's permission.

Rodriguez testified that he did not know what Boudoin's assignment was at the time of the incident, whether Boudoin was not at his assigned post or why Boudoin was in that area. Rodriguez said he knew that Boudoin was not assigned to take plaintiff to the shower. Rodriguez testified that he, defendant Perrier, Boudoin and McIntyre were all non-POST certified deputies with the same rank. He stated that Perrier was still relatively new and had only been working at the jail for a few months.

6

On cross-examination, Rodriguez testified that the whole incident lasted no more than five minutes.  He said that he and Perrier did not intervene physically because they wanted to avoid escalating the fight.  Rodriguez stated that, if they had tried to intervene, plaintiff might have thought that they were trying to attack him or McIntyre and Boudoin might have begun fighting with them.  Rodriguez testified that McIntyre carried out the majority of the beating and that McIntyre was "not a small person."  He said that McIntyre was assigned to Pod 3A that day.

Rodriguez stated that he and Perrier followed the proper protocol, which was to send a code 108 on their radios, meaning that an officer needs assistance.  He said that, when the code 108 is sent, "everyone drops everything and comes" to help.

On cross-examination, Rodriguez reiterated that Rodgers was outside of his cell and handcuffed, and that Boudoin yelled at McIntyre to remove the cuffs, which McIntyre did. Rodriguez testified that Boudoin struck plaintiff on the right side of his head with a closed left fist, plaintiff lost his balance, and McIntyre grabbed Rodgers and pulled him to the ground.   Rodriguez said that Boudoin stood there while McIntyre struck Rodgers repeatedly in the head.

Rodriguez testified that he was out of visual range of plaintiff's cell after Sgt. Rogers told plaintiff to take a shower and did not know what caused Boudoin and McIntyre to become irate.  Rodriguez said he did not see plaintiff "resist arrest" or assault any deputy in any way.

7

3.   Testimony of Sergeant Zackery Rogers

Zackery Rogers testified that he has been employed by the Jefferson Parish Sheriff's Office for 12 years and is now a sergeant and the director of prisoner transport. He stated that he was a sergeant in inmate security on the day watch at the jail on December 11, 2014, where his duties were to supervise the deputies and inmates.

Sgt. Rogers recalled that, on that date, a deputy came and fetched him from the supervisor's office on the third floor near the isolation tank where plaintiff was housed. He testified that there had been some confusion about whether plaintiff had refused to shower and that he went to the isolation area to sort it out. Sgt. Rogers stated that the confusion concerned which of two inmates wanted to shower first. The sergeant said he told plaintiff that his time was now and told Perrier to take plaintiff to the shower on the second floor, which was Perrier's assignment that day. Sgt. Rogers said he did not know whether plaintiff had earlier refused to shower, but that plaintiff agreed to go when Sgt. Rogers told him to go.

Sgt. Rogers testified that he then returned to his office. He said that the code 108 radio call for an officer needing assistance near the isolation tank came within minutes of his return and that he responded immediately. He stated that plaintiff was on the floor when he arrived. He testified that he saw Perrier, Rodriguez, McIntyre, Boudoin and a few other officers, but that no one was hitting plaintiff. Sgt. Rogers stated that some deputies handcuffed plaintiff and escorted him to the medical area for treatment of his injuries.

8

Sgt. Rogers "vaguely" recalled that there was blood on plaintiff's face and that pictures were taken of plaintiff's injuries after he was treated, but the sergeant did not recall any details of the injuries. He stated that the photographs were uploaded into a "Veripic" system and sent to the Special Investigations Unit of the Sheriff's Office.

On cross-examination, Sgt. Rogers stated that it was standard procedure to take photos of an inmate's injuries and upload them to Veripic. He testified that he reported the incident to his lieutenant and that the matter was sent to the Special Investigations Unit, but he was not sure what disciplinary action Boudoin or McIntyre received. He said that neither one is currently employed by the Sheriff's Office, but he did not know whether they resigned or were fired.

4.   Testimony of Sergeant John Patterson

John Patterson testified that he has been employed by the Jefferson Parish Sheriff's Office for 45 years, is the athletic director at the Correctional Center and was the sergeant in charge of recreation on December 11, 2014. He stated that inmates are taken out of their cells for recreation for thirty minutes four days per week.

Sgt. Patterson said he was in the yard when he heard a code 108 radio call that an officer needed assistance and he immediately ran to assist. He said he arrived at the scene "a couple of minutes" later and saw plaintiff on the ground with Boudoin, McIntyre and another deputy, who were struggling to put handcuffs on Rodgers. Sgt. Patterson stated

9

that several other officers were in the area. He did not remember who was the third deputy on the ground. He stated that he did not see any officers punching or assaulting plaintiff.

Sgt. Patterson testified that he took charge and handcuffed plaintiff. He did not recall whether he pulled McIntyre and Boudoin off or told them to get off of plaintiff. However, he testified that he thought Rodgers was resisting the deputies and that he would not have pulled a deputy off an inmate because someone might get hurt during such an effort. The sergeant said he struggled to handcuff Rodgers and had to force plaintiff's hands behind his back. Sgt. Patterson testified that Rodgers was face down on the ground and would not put his hands behind his back. The sergeant stated that no deputies were struggling with plaintiff when he took over and that the other officers at the scene must have gotten out of his way. He testified that he saw blood on Rodgers, pulled plaintiff to his feet and instructed a deputy who was not involved in the incident to take plaintiff, who had several injuries, to the medical unit.

Sgt. Patterson said he does not know whether McIntyre or Boudoin was disciplined as a result of the incident, but he thought that "a couple of them" were dismissed. He stated that he does not know where either McIntyre and Boudoin are now.

On cross-examination, Sgt. Patterson testified that the incident was almost over when he arrived. He stated that, as a matter of routine practice, he would not grab an officer who was struggling with an inmate and fling the officer aside.

4.   <u>Proffered Testimony</u>

One of plaintiff's witnesses, Letitia Lewis, who was subpoenaed as "Nurse Latish," Record Doc. No. 78, telephoned the court the day before the trial/evidentiary hearing to advise that she had delivered a baby the day before, was still in the hospital and could not attend the hearing.  She said she would be willing to testify at a later date if the court held the case open.  She did not attend the hearing.  Rodgers made a proffer of Lewis's testimony, stating that she did <u>not</u> witness the attack on him, but would testify that she stitched his wounds and treated him at the medical unit after he was attacked.

Another of plaintiff's witnesses, Kenya Franklin, was served with a subpoena, Record Doc. No. 75, but did not attend the hearing and did not contact the court to explain her non-appearance.  Rodgers made a proffer of Franklin's testimony, stating that she would testify that she witnessed the whole incident, including Boudoin and McIntyre beating him, and that she radioed for backup.

B.   <u>Defendant's Case-in-Chief Witness Testimony of Jamal Perrier</u>

Defendant Jamal Perrier testified that he is currently employed by Brown's Dairy. He said he worked at Jefferson Parish Correctional Center as a deputy in inmate security for five months.  He stated that he was placed on indefinite suspension pending an investigation of the incident with Rodgers on December 11, 2014, but that he was not sure of the investigation's results because he resigned to take another job.

Perrier said he was responsible for the isolation unit showers on December 11, 2014. He stated that plaintiff was angry about being taken to the shower first. Perrier testified that Rodgers threatened him, saying that he would make Perrier's job "hard" and would "get me when we got to the second floor." Perrier said he thought that plaintiff meant that plaintiff would attack him in the shower. Perrier stated that he is five feet seven inches tall and Rodgers is about six feet three inches tall.

Perrier testified that former Deputy McIntyre came out from Pod 3A because he overheard the discussion between Rodgers and Perrier. Defendant said that McIntyre told him to mark plaintiff's comments as a refusal to shower and that McIntyre then fetched Sgt. Rogers to the area. Perrier testified that Sgt. Rogers told him to proceed with plaintiff's shower, so defendant opened the food slot, handcuffed plaintiff and then opened the cell door. Perrier said that plaintiff asked McIntyre if he could clean out his cell and began kicking styrofoam food trays out of the cell at Boudoin and McIntyre.

Defendant testified that Boudoin was on Pod 3C, a separate area of the jail, and came all the way across the hall to his area, although Boudoin had no business being there. Perrier said that former Deputy Boudoin began provoking Rodgers, telling plaintiff to swing at Boudoin and fight with him. Perrier stated that Boudoin yelled at McIntyre to take plaintiff's handcuffs off and that McIntyre did so. Perrier testified that Boudoin struck Rodgers twice with his left fist and that a ring on Boudoin's hand cut plaintiff's face. Perrier said that McIntyre threw Rodgers to the floor and began punching his torso, while

Boudoin punched plaintiff's face and neck and kicked him with steel-toed boots. Defendant said that deputies were trained that they were not allowed to strike an inmate in the face and neck area, which they call the "red zone."

Perrier stated that Boudoin and McIntyre were "veterans" at the jail. He said he backed away and called for backup because he did not want to intervene in the situation. He testified that Rodgers did not swing at or provoke anyone, and that Boudoin and McIntyre just attacked plaintiff. Defendant said he wrote a report of the incident.

On cross-examination, defendant testified that he was suspended pending an investigation and that he thought the other deputies were suspended, but he never went back to the job and thus did not know. He stated that, when plaintiff's cell door was opened, Rodgers began kicking food trays at Boudoin and McIntyre. Perrier said that he was on plaintiff's right side, McIntyre was on the left and Boudoin was in the center. Defendant stated that, because Rodgers was handcuffed, he could only use his feet, but he could have pushed the food trays to the side of the cell. Perrier testified that Boudoin provoked plaintiff, who then kicked the food trays toward Boudoin as Boudoin wanted.

Perrier said that he did not initially take Rodgers to the shower because plaintiff threatened him. Defendant explained that inmates are unrestrained in the shower and that, given his short-term experience in corrections, he did not feel safe taking Rodgers there. He said he did not know whether plaintiff might have had a weapon and he felt that it was a dangerous situation for him. Perrier stated that he reported the threat to Sgt. Rogers, who

13

told him to proceed with the shower, and that defendant tried to do so, but he was unable to because Boudoin and McIntyre attacked plaintiff.  Perrier said it was "the right thing to do" to report to the sergeant when plaintiff threatened him.

Perrier denied that he allowed Boudoin and McIntyre to assault Rodgers.  He stated that Rodgers was a lot bigger than he was.  Perrier testified that he did not call Boudoin and McIntyre to help him with plaintiff and that they just showed up.  He said he did not tell them to step back.  Perrier testified that he had no reason to know that Boudoin and McIntyre were going to attack Rodgers.  He said he had no knowledge before the incident that either of the deputies had any animosity toward plaintiff.  Defendant stated that he had "no clue how I could have prevented" the assault because it "happened so fast" and that there was nothing he could have done except call a code 108 for assistance.

On re-direct examination, Perrier said that the fight lasted no more than five minutes and that he and Deputy Rodriguez called for backup at the same time.

C.    Exhibits

Plaintiff's Exhibits 1 and 2 were received into evidence without objection.  Exhibits 1 and 2 were the same records that plaintiff had requested pretrial for use as evidence in support of his case.

Plaintiff's Exhibit 1 consists of plaintiff's medical records during his incarceration in the Jefferson Parish Correctional Center.  The records confirm that Rodgers was seen by a nurse (whose signature is not legible) and a medical assistant on December 11, 2014 at

8:40 a.m.  The record shows that the medical assistant cleaned and applied "steri-strips"[2] to a laceration on plaintiff's left cheek and one on his left jawline/cheek, and peeled off a scab, cleaned and applied a band-aid to plaintiff's left elbow.  No other treatment was noted.  The medical assessment was "alteration in comfort" following "involvement in 108."  Rodgers was told to follow up with a sick call request if any issues arose.

The next medical record is a request by Rodgers on February 20, 2015, more than two months later, to see a doctor because he was losing sight in his left eye and hearing in his left ear and his vision was blurry.  He was seen that day by a licensed practical nurse, who found no signs or symptoms of distress.

On March 2, 2015, Rodgers asked to see a doctor about losing sight in his left eye.  Nurse practitioner Kimberly Pounds examined plaintiff on March 5, 2015.  Pounds noted that Rodgers complained of blurry vision in his left eye since the December 2014 fight.  He denied any eye pain.  His visual acuity was 20/10 with both eyes, 20/10 with his right eye and 20/30 with his left.  The clinical impression was elevated blood pressure.

Plaintiff submitted a request for eye glasses on March 5, 2015.  An eye glasses procedure letter was sent to him on March 12, 2015, explaining that he would have to pay $90 for eyeglasses and an examination by an eye doctor, must certify that he had $90 in his

---

[2]"Steri-Strips" is a brand name for adhesive bandages used for closure of small cuts and wounds. http://www.nexcare.com/3M/en_US/nexcare/products/catalog/~/Nexcare-Steri-Strip-Skin-Closure?N=4326+3294529207+3294631539&rt=rud (visited Dec. 6, 2016).

inmate account and must sign an authorization to release the money to the doctor before an appointment would be made.

On March 18, 2015, Rodgers was seen by Richard Richoux, M.D., for followup of a chronic mental condition unrelated to the December 2014 incident. Rodgers told Dr. Richoux that he had received instructions from the eye doctor and needed to discuss them with nurse Cindy Lachney. Plaintiff said he was "doing okay" with his medication and had no complaints. Subsequent medical records contain no mention of any complaints related to plaintiff's injuries in December 2014.

Plaintiff's Exhibit 2 is the Sheriff's log-in book for December 11, 2014. The log entries for Pod 3A show that Deputies Rodriguez, McIntyre and Perrier were on duty and that another inmate was taken to shower at 8:15 a.m. and returned to his cell at 8:35 a.m. A "108" involving Rodgers at the isolation cell was logged at 8:35 a.m. The log entries for Pod 3D, where Deputies K. Franklin and R. Chehardy were on duty and apparently shared visual check duties of the isolation tank, state that Rodgers was seen in his cell at 7:45 a.m., that "Perrier escorts . . . Rodgers to shower (Refused)" at 8:25 a.m., and that "Rodgers returned," presumably from medical, at 9:02 a.m.

II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Plaintiff's motion for summary judgment was deferred to trial, Record Doc. No. 67, because it presented no grounds for summary judgment in his favor. Therefore, the

recommended outcome of his summary judgment motion will be the same as the recommended outcome of the trial/evidentiary hearing.

2.      Rodgers was a pretrial detainee at the time of the December 11, 2014 incident about which he complains.  In Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996), the Fifth Circuit held "that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including . . . protection from harm, during their confinement." Id. at 650.  Thus, regardless whether the inmate is a pretrial detainee or a convicted prisoner, the standard of liability is the same for episodic acts or omissions of jail officials that expose an inmate to being harmed by another inmate or a deputy, such as occurred in this case.  Kitchen v. Dallas Cnty., 759 F.3d 468, 477, 480 (5th Cir. 2014); Hamilton v. Lyons, 74 F.3d 99, 104 n.3 (5th Cir. 1996); Hare, 74 F.3d at 650.

3.      Prison officials have a duty to protect inmates from harm or violence by other officers and to take reasonable measures to protect an inmate's safety.  Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Kitchen, 759 F.3d at 480; Carrothers v. Kelly, 312 F. App'x 600, 602 (5th Cir. 2009); Longoria v. Texas, 473 F.3d 586, 593-94 (5th Cir. 2006) (citing Hale v. Townley, 45 F.3d 914, 919 (5th Cir. 1995); Harris v. Chanclor, 537 F.2d 203, 205-06 (5th Cir. 1976)).  The Eighth Amendment standard enunciated in Farmer applies to a prisoner's claim that prison officials failed to protect him from harm inflicted by other inmates or deputies.  Thus, prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm.

Farmer, 511 U.S. at 834; Williams v. Hampton, 797 F.3d 276, 281 (5th Cir. 2015); Longoria, 473 F.3d at 594; Newton v. Black, 133 F.3d 301, 308 (5th Cir. 1998).

4.  Only deliberate indifference, "an unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976); accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976).  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Farmer, 511 U.S. at 847.

5.  An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  Id. at 834 (quotation omitted).

6.  Further, plaintiff must establish that defendant possessed a culpable state of mind.  Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Thus, a prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837; accord Williams, 797 F.3d at 281; Newton, 133 F.3d at 308.  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm."  Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir.

2003).  If the court finds that one of the components of the test is not met, it need not

address the other component.  Johnson v. Anderson, 255 F. App'x 851, 853 (5th Cir. 2007);

Conlin v. Thaler, 347 F. App'x 983, 984 (5th Cir. 2009); Davis v. Scott, 157 F.3d 1003,

1006 (5th Cir. 1998).

7.     In the context of claims that jail officials were deliberately indifferent in

failing to protect an inmate against violence by other inmates, the Supreme Court held in

Farmer that

> [if a] plaintiff presents evidence showing that a substantial risk of inmate
> attacks was longstanding, pervasive, well-documented, or expressly noted by
> prison officials in the past, and the circumstances suggest that the defendant-
> official being sued had been exposed to information concerning the risk and
> thus "must have known" about it, then such evidence could be sufficient to
> permit a trier of fact to find that the defendant-official had actual knowledge
> of the risk.

Farmer, 511 U.S. at 842-43.  Thus, in Adames v. Perez, 331 F.3d 508, 512-13 (5th Cir.

2003), the Fifth Circuit vacated and remanded a jury verdict in favor of an inmate, holding

that evidence of isolated previous attacks by inmates on inmates other than plaintiff was

insufficient to show deliberate indifference to plaintiff's safety or to support a jury's

verdict that prison officials had failed to protect him.

8.     The Supreme Court has recently reaffirmed that "deliberate
indifference" is a stringent standard of fault, requiring proof
that a municipal actor disregarded a known or obvious
consequence of his action. . . .  The "deliberate indifference"
standard permits courts to separate omissions that "amount to
an intentional choice" from those that are merely
"unintentionally negligent oversight[s]."

Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citing Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997)) (additional citations and footnote omitted) (emphasis added).  "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291; accord Williams, 797 F.3d at 281.

9.    The Fifth Circuit first recognized the doctrine of "bystander liability" in the excessive-force context in Hale, holding that "an officer who is present at the scene [of an arrest] and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." Hale, 45 F.3d at 919 (citations omitted).  The Fifth Circuit has applied the same bystander liability standard when an inmate accuses a prison official of failing to intervene to protect the inmate from the use of excessive force by other officers. Kitchen, 759 F.3d at 480-81; Carrothers, 312 F. App'x at 602; Davis v. Cannon, 91 F. App'x 327, 329 (5th Cir. 2004).

10.    An officer may be liable under a theory of bystander liability when he "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Whitley v. Hanna, 726 F.3d 631, 646 (5th Cir. 2013) (quotation and citations omitted) (emphasis added); accord Kitchen, 759 F.3d at 480; Hale, 45 F.3d at 919.  The factfinder must also "consider whether an officer 'acquiesce[d] in' the alleged constitutional violation." Whitley, 726 F.3d 647 (quoting Hale, 45 F.3d at 919).

11.     An officer's mere presence during another officer's use of excessive force does not alone give rise to bystander liability.  Malone v. City of Fort Worth, No. 4:09-CV-634-Y, 2014 WL 5781001, at *16 (N.D. Tex. Nov. 6, 2014), appeal dismissed sub nom. Malone v. Tidwell, 615 F. App'x 189 (5th Cir. 2015) (citing Whitley, 726 F.3d at 646-47; Vasquez v. Chacon, No. 3:08-CV-2046-M, 2009 WL 2169017, at *6 (N.D. Tex. July 20, 2009), aff'd, 390 F. App'x 305 (5th Cir. 2010); Nowell v. Acadian Ambulance Serv., 147 F. Supp. 2d 495, 507 (W.D. La. 2001)).  For the duty to intervene to arise, "[t]he officer must have a reasonable opportunity to realize the excessive nature of the force and a realistic opportunity to stop it."  Id. (quotation omitted) (citing Hale, 45 F.3d at 919; Vasquez, 2009 WL 2169017, at *6; Nowell, 147 F. Supp. 2d at 507); accord Grandpre v. Correct Health, No. 16-1543, 2016 WL 4539442, at *11 (E.D. La. Aug. 29, 2016), report & recommendation adopted sub nom. Grandpre v. Health, 2016 WL 4987265 (E.D. La. Sept. 19, 2016).  In determining reasonableness, the factfinder should consider "both the duration of the alleged use of force and the location of the [person subjected to the force] relative to the allegedly bystanding officers."  Malone, 2014 WL 5781001, at *16 (citing Vasquez, 2009 WL 2169017, at *6).

12.     "An officer's failure to take reasonable measures to protect an inmate from excessive force can give rise to § 1983 liability; however, the Constitution does not require unarmed officials to endanger their own safety in order to protect a prisoner threatened with physical violence."  Carrothers, 312 F. App'x at 602 (citing Longoria, 473 F.3d at 593-94).

13.     In finding the facts as to which the foregoing legal principles apply in this case, I find that Rodgers has failed to establish a constitutional violation for the following reasons.  First and most importantly, I find that Rodgers is <u>not</u> a credible witness and that the details of his testimony, especially concerning defendant Perrier's role in the incident, cannot be credited.  Although it is undisputed that Boudoin and McIntyre assaulted Rodgers without justification, plaintiff's version of the incident – that Perrier removed plaintiff's handcuffs at Boudoin's direction and allowed Boudoin and McIntyre to beat him "for a good ten minutes" – is wholly lacking in credibility.  This testimony was in conflict with the testimony of the other, credible witnesses and the documentary exhibits, none of which support or corroborate the time line, type of injuries or other events involving Perrier's alleged failure to protect him about which Rodgers testified.  In addition, Rodgers is a convicted criminal whose conviction may properly be considered in assessing his lack of credibility.  Fed. R. Evid. 609(a)(1).  In short, plaintiff's story about Perrier's alleged failure to protect him in this case was self-serving, uncorroborated by any other credible evidence and cannot be believed.

14.     Specifically, the version of events that Rodgers provided was so replete with hyperbole, inconsistency and invention that it simply cannot be credited.  First and foremost among the fallacies in plaintiff's story is that Perrier removed plaintiff's handcuffs at Boudoin's direction.  No other evidence corroborates plaintiff's testimony in this regard.  On the contrary, Perrier's and Rodriguez's testimony that they saw McIntyre remove the handcuffs at Boudoin's instigation was entirely credible.

15.     I also reject as falsehood Rodgers's testimony that defendant did nothing while Boudoin and McIntyre beat him for ten minutes.  No other evidence corroborates plaintiff's testimony in this regard.  On the contrary, Perrier's and Rodriguez's testimony was entirely credible that they promptly and prudently called for backup when Boudoin and McIntyre started hitting plaintiff and that the entire incident lasted no longer than five minutes.  The testimony of Perrier and Rodriguez regarding the brevity of the incident and the promptness of their "108" calls was corroborated by the credible testimony of Sergeants Rogers and Patterson regarding their quick response to the call for officer assistance and by the log book entries stating that Perrier attempted to escort plaintiff to the shower at 8:25 a.m., that a "108" involving Rodgers was logged at 8:35 a.m. and that he was returned to his cell at 9:02 a.m.

16.     Other aspects of plaintiff's testimony that were not credible and indicate that his testimony was exaggerated and self-serving include his statements that he needed stitches in two wounds on his face, had lacerations to both elbows and suffered a fractured cheekbone and severe pain in his knees as a result of the attack.  The medical records document that Rodgers required only steri-strips for two lacerations on his face and a band-aid on one elbow.  There is no evidence of any subsequent sick call requests, examinations or tests for a fractured cheekbone or any pain.  The medical records undermine plaintiff's testimony by reflecting that he suffered injuries much less severe than he testified about or that would be expected to result from a "good ten-minute" beating by two attackers.

17.     On the other hand, Perrier, Rodriguez and Sgt. Rogers were entirely credible about the events leading up to and during the incident.  Their demeanor and manner of testifying were calm, detached, detailed and highly professional.  Perrier's testimony in particular was sincere, restrained, detailed and sensible.  Viewed in the entirety of the circumstances, I am convinced that their account is credible.  Their testimony and the documentary evidence corroborate each other without substantial discrepancies.  Thus, I find the testimony of Perrier, Rodriguez and Sgt. Rogers credible and the testimony of plaintiff not credible.

18.     Based on the credible testimony of the witnesses and the other record evidence, I find that, shortly after Sgt. Rogers told plaintiff to go take a shower, Perrier handcuffed and removed plaintiff from his cell and tried to escort him to the shower.  However, Perrier was interrupted by Boudoin, who began harassing plaintiff and who told McIntyre to remove the handcuffs, which McIntyre did.  I further find that Boudoin and McIntyre attacked plaintiff quickly, unexpectedly and without warning, and that Perrier had no prior knowledge that Boudoin or McIntyre harbored any animosity toward Rodgers or intended to assault him.  Perrier is small in stature.  It would have been entirely imprudent for him to attempt to intervene in this incident involving men of much larger and more powerful stature.  I also find that Perrier and Rodriguez immediately called for backup and that backup officers responded within a few minutes, during which time the attack ceased and Rodgers was re-handcuffed.  I find that the whole incident lasted no more than five minutes.

24

19.     Under these circumstances, Perrier cannot be liable for any deliberately indifferent failure to protect Rodgers or bystander liability.  There is no evidence that defendant knew of and disregarded an excessive risk to plaintiff's health or safety. Although Perrier knew that Boudoin and McIntyre were violating plaintiff's constitutional rights by using excessive force, there is no evidence that Perrier had a reasonable opportunity to prevent the harm <u>and</u> chose not to act to prevent it.  On the contrary, Perrier had no prior knowledge that an attack might occur.  Once the attack started, defendant, who was physically smaller than both Rodgers and McIntyre and who had only five months of experience on the job, acted according to a standard and reasonable procedure, as did Rodriguez, who had about 17 months of experience at that time.  Perrier and Rodriguez did not endanger themselves or anyone else by trying to break up the attack, but they reasonably called for backup and waited for assistance to arrive, which they knew would take only a few minutes.  Based on the credible evidence of the circumstances presented in this case, Perrier was not aware of facts from which an inference could be drawn that a substantial risk of serious harm to plaintiff existed, did not draw any such inference and had no constitutional duty to endanger his own safety by intervening physically to protect Rodgers from Boudoin and McIntyre.  <u>Longoria</u>, 473 F.3d at 594.

20.     In short, because Perrier's conduct was reasonable under the circumstances, plaintiff cannot establish the essential elements of his failure to protect claim under Section 1983.

20.     I find that the proffered testimony of the Jefferson Parish Corrections Center nurse, Letitia Lewis, is not material to the issues in this action and would be merely cumulative of plaintiff's testimony and the medical records in evidence. As plaintiff stated in his proffer, Lewis was not a witness to the attack on him, but she treated his wounds after the attack. Plaintiff's only claim in this matter is that defendant Perrier failed to protect him from the unprovoked attack by Boudoin and McIntyre. Lewis's testimony is not relevant to Perrier's liability, but is only relevant to show the nature and extent of plaintiff's damages. It is undisputed that the attack occurred and that Rodgers suffered injuries requiring medical treatment. The medical records in evidence confirm plaintiff's testimony that he suffered injuries and that the nurse on duty treated lacerations on his face and elbow. Because I find that Perrier is not liable for any unconstitutional failure to protect Rodgers, Lewis's testimony regarding the nature and extent of plaintiff's damages is unnecessary. Accordingly, I find that this case need not be held open to obtain Lewis's testimony.

21.     I find that the proffered testimony of Deputy Kenya Franklin would be merely cumulative and duplicative of the testimony of plaintiff, Perrier and Rodriguez regarding the circumstances of the incident, in which these three all participated. Rodgers stated that Franklin would testify that she witnessed the whole incident, including Boudoin and McIntyre beating him, and that she radioed for backup. It is undisputed that Boudoin and McIntyre attacked plaintiff without provocation and that Perrier and Rodriguez both

radioed for backup, which arrived within a few minutes. Accordingly, I find that this case need not be held open to obtain Franklin's testimony.

22.    For the reasons discussed above, no violation of a constitutional right occurred when Rodgers was injured by other deputies because Perrier acted under circumstances that justified his reasonable failure to intervene physically in the rapid and unforeseen attack on plaintiff. Applying the bystander liability and deliberate indifference standards, Perrier's conduct must be judged objectively reasonable under these circumstances, and judgment must be entered in his favor, dismissing plaintiff's failure to protect claim with prejudice.

23.    As a general matter, "costs – other than attorney's fees – should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Defendant is the prevailing party in this case.

* * * * *

To whatever extent, if any, that the foregoing findings of fact constitute conclusions of law, or vice versa, they are adopted as such.

## RECOMMENDATION

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED**, his claims against defendant Jamal Perrier be **DISMISSED WITH PREJUDICE** and judgment be entered against plaintiff and in favor of defendant, plaintiff to bear all costs.

27

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[3]

New Orleans, Louisiana, this ___22nd___ day of December, 2016.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[3]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

28